[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 6, 2006
THOMAS K. KAHN
CLERK

_____

Nos. 05-16660 and 06-10756
Non-Argument Calendar

_____

BIA Nos. A95-240-792 & A95-240-793

ESTEBAN FERNANDO ANTONI PARRA,
ROSA HELENA CHAPARRO,
SAMARA HELENA PARRA,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petitions for Review of a Decision of the
Board of Immigration Appeals

_____

**(September 6, 2006)**

Before ANDERSON, BIRCH and HULL, Circuit Judges.

PER CURIAM:

Esteban Fernando Antoni Parra, his wife, Rosa Helena Chaparro, and his daughter, Samara Helena Parra, petition for review of (1) the Board of Immigration Appeals' ("BIA's") decision adopting and affirming the immigration judge's ("IJ's") order, which found them removable and denied their application for asylum, withholding of removal under the Immigration and Nationality Act ("INA") and relief under the United Nations Convention Against Torture ("CAT"), 8 U.S.C. §§ 1158, 1231(b)(3); 8 C.F.R. § 208.16(c); and (2) the BIA's order denying their motion to reopen, 8 C.F.R. § 1003.2(c). After review, we dismiss in part and deny in part the petitions for review.

## I. BACKGROUND

### A. The Petitioners' Arrival

Parra last arrived in the United States on May 7, 1999, and his wife and daughter arrived later that year, on December 2, 1999. The petitioners, who are all natives and citizens of Colombia, were admitted as nonimmigrant visitors for pleasure but overstayed their visas and are subject to removal under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B).

### B. The Petitioners' Claims

On March 6, 2002, Parra filed an application for asylum, withholding of removal and CAT relief, alleging that he had been persecuted on account of his political opinion by members of the Revolutionary Armed Forces of Colombia

2

("FARC").[1]  Parra owned and managed multiple companies in Colombia.

According to Parra, the FARC began threatening him in November 1997 because

he had "records in the Liberal Party."[2]  The FARC first contacted Parra at his office

by calling and requesting that he pay a "vacuna," or a monthly quota of money, in

support of the FARC's cause.  Parra tried to delay, telling the caller that he needed

time to gather the money.  Parra later received two more telephone calls reminding

him of his promise.  As a result of these calls, in 1998, Parra decided to close his

office and work directly in the warehouses.  Later, in February 1998, Parra

received a telephone call from the FARC at his home, in which the caller, in an

aggressive manner, indicated that the money they were asking for was a tax.  The

caller advised that if Parra continued to hide from them, they knew where he and

his family lived.  Parra moved in March 1998 in order to avoid the FARC's pursuit

because he was not willing to contribute to their "terrorist cause," because of his

involvement with politics and because he did not have the ability to pay the

---

[1]Parra's wife and daughter were included in the application.

[2]Parra stated that he had been a member of the Liberal Party since the 1970s and helped coordinate meetings for the party until 1998.  Parra also supported the New Liberalism political movement starting in1980, but withdrew from active membership in the movement in 1989 because of threats.  There is no indication that these threats came from the FARC, however, and Parra stated that these threats stopped once he withdrew from the movement.

requested quota.[3]  After moving, Parra did not have any other contact with the FARC until October 1998.

In October 1998, while Parra was assisting his son, Daniel Fernando Parra ("Daniel"), with his business, three men came to Daniel's business in the morning asking for Parra.  These men forced Parra to get in their car by identifying themselves as members of the FARC and showing him a weapon.  As they were driving around, the men mistreated Parra and slapped him in the face.  According to Parra, their intention was to frighten him and give him an ultimatum so that he would make the requested payments in exchange for his peace.  The men let Parra go around 7:30 p.m. that evening, leaving him in a town about an hour away from his home.

As a result of this event, Parra relocated to Ecuador for two months, returned to Colombia, and in February 1999, moved in with his mother while his wife and children moved in with another relative.  In May 1999, Parra left Colombia to live in the United States temporarily until conditions improved.  Because conditions did not improve, his family joined him in the United States in December 1999, but his two sons, Daniel and Esteban Dario Parra ("Esteban"), later returned to Colombia to finish school.  His two sons eventually came back to the United States after

---

[3]At the asylum hearing, Parra testified that he had the money to pay the FARC, but that he did not do so because his "political ideology does not go[] with their thinking."

Esteban received a threatening telephone call in August 2001, instructing him to tell Parra to report to the FARC unless he "wanted to receive [his] child in a coffin in pieces." At that point, Parra decided to seek political asylum in the United States because he feared that he would be kidnaped, tortured or even killed if he returned to Colombia.

## C.    Immigration Proceedings

The record contained several documents in support of Parra's asylum application, including a letter indicating that his son Esteban had been granted asylum in the United States on March 11, 2002. At the asylum hearing, the government objected to the introduction of this evidence, noting that Esteban's asylum application was not included in the record. Parra stated that he had requested a copy of Esteban's asylum application but had not received it yet, and that Esteban was present and available to testify regarding his asylum application if necessary.

The IJ allowed the letter, but cautioned that her decision on the petitioners' application would be based on the merits of their case, and not on the fact that Esteban had been granted asylum. Esteban did testify at the petitioners' asylum hearing, and his testimony was consistent with Parra's claims.

5

The IJ ultimately denied the petitioners' applications for asylum, withholding of removal and CAT relief, and ordered them removed to Colombia. Specifically, the IJ denied the petitioners' asylum application as untimely, finding no extraordinary circumstances to excuse its late filing. The IJ also denied the petitioners' application for withholding of removal, finding that the FARC's request that Parra pay a war tax, the threatening telephone calls, and Parra's detention without being physically harmed, did not amount to past persecution or establish by a clear probability that it would be more likely than not that the petitioners would suffer if returned to Colombia. The IJ also noted that these acts demonstrated extortion, but found that there was insufficient evidence to demonstrate a mixed motive based in part on Parra's political opinion. Finally, the IJ denied the petitioners' request for CAT relief, finding that the petitioners had not been tortured, and that the FARC was not a governmental entity. The petitioners appealed the IJ's decision to the BIA, which adopted and affirmed the IJ's decision, and dismissed the petitioners' appeal.

In addition to filing a timely petition for review with this Court, the petitioners also filed a motion to reopen with the BIA. Petitioners' motion stated that they now were in possession of Esteban's asylum application, which they claimed was a crucial and material piece of evidence that would have "significantly increased the likelihood" that they would have prevailed. The petitioners also

6

alleged due process and equal protection violations. The BIA denied the motion to reopen, finding that Esteban's asylum application did not represent new facts. Specifically, the BIA noted that the IJ already had considered the fact that Esteban was granted asylum and the facts underlying his claim, but had concluded that these facts did not excuse the petitioners' untimely asylum application or demonstrate that they had experienced persecution.

The petitioners filed another timely petition for review from the BIA's decision denying their motion to reopen. The two petitions for review in our Court have now been consolidated.

## II. BACKGROUND

### A. Asylum Application

Petitioners' brief argues that the IJ erred in denying their asylum application. We lack jurisdiction to review this decision because the IJ determined that the petitioners' asylum application was untimely. See INA § 208(a)(3); 8 U.S.C. § 1158(a)(3); see also Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003) (noting that 8 U.S.C. § 1158(a)(3) "divests our Court of jurisdiction to review a decision regarding whether an alien complied with the one-year time limit or established extraordinary circumstances that would excuse his untimely filing"). Accordingly, to the extent that the petitioners seek review of the denial of their asylum application, we dismiss the petition.

**B.     CAT Relief**

Because the petitioners do not challenge the denial of their application for CAT relief, they have abandoned that issue.  See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005).

**C.     Withholding of Removal Claim Based on Membership in a Particular Social Group**

We also lack jurisdiction to review the petitioners' claim for withholding of removal based on their membership in a particular social group because the petitioners failed to exhaust this claim before the BIA.  See INA § 242(d), 8 U.S.C. § 1252(d) ("A  court may review a final order of removal only if . . . the alien has exhausted all administrative remedies available to the alien as of right."); see also Fernandez-Bernal v. U.S. Att'y Gen., 257 F.3d 1304, 1317 n.13 (11th Cir. 2001) (explaining that the exhaustion requirement is jurisdictional and precludes review of a claim that was not presented to the BIA).  The petitioners' brief to the BIA contained no substantive argument or discussion concerning persecution on account of their membership in a particular social group.  Moreover, this issue was not raised in Parra's asylum application or before the IJ.  Accordingly, we dismiss the petition in part.

**D.      Withholding of Removal Claim Based on Political Opinion**

The government argues that the petitioners also failed to exhaust their claim for withholding of removal based on their political opinion. We disagree. The petitioners' brief to the BIA sufficiently raised this claim. See Alim v. Gonzales, 446 F.3d 1239, 1253-54 (11th Cir. 2006). Accordingly, we have jurisdiction to review that claim and now do so.

An alien is entitled to withholding of removal under the INA if he can show that his "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." INA § 241(b)(3), 8 U.S.C. § 1231(b)(3)(A). "The alien bears the burden of demonstrating that it is 'more likely than not' [he] will be persecuted or tortured upon being returned to [his] country." Sepulveda, 401 F.3d at 1232. This standard is more stringent than the "well-founded fear of future persecution" required for asylum. Mazariegos v. U.S. Att'y Gen., 241 F.3d 1320, 1324 n.2 (11th Cir. 2001).

An alien can meet his burden of proof in either of two ways. First, an alien can show past persecution in his country that was motivated, at least in part, by a protected ground, in which case a rebuttable presumption is created that his life or freedom would be threatened if he returned to his country. See Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1375 (11th Cir. 2006); Mendoza, 327 F.3d at 1287. If the alien makes such a showing, then the burden shifts to the government to show that

9

the conditions in the country have changed, or that the alien could avoid a future threat by relocating within the country. Tan, 446 F.3d at 1375; Mendoza, 327 F.3d at 1287. Second, the alien can meet his burden of proof by showing that it is more likely than not that he would be persecuted in the future on account of a protected ground. Tan, 446 F.3d at 1375. The alien cannot make this showing, however, if the IJ finds that the alien could avoid a future threat by relocating to another part of his country. Id.

We conclude that substantial evidence supports the IJ's denial of the petitioners' application for withholding of removal.[4] First, the petitioners failed to establish that they suffered past persecution. See Sepulveda, 401 F.3d at 1231 (stating that "persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation") (quotation marks omitted). Although Parra received threatening telephone calls from the FARC and was detained but not harmed for part of one day, these events do not compel a finding that Parra suffered past persecution. Id. (concluding that menacing telephone calls

_____

[4] Because the BIA expressly adopted and affirmed the IJ's decision, we review the IJ's decision in this case. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). The IJ's factual determinations are reviewed under the substantial evidence test, and we "must affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. at 1283-84 (quotation marks omitted). Under this highly deferential standard of review, the IJ's factual determinations can be reversed "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal . . . ." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc), cert. denied, 544 U.S. 1035, 125 S. Ct. 2245 (2005).

and threats did not compel a finding of past persecution); Zheng v. U.S. Att'y Gen., 451 F.3d 1287, 1290-91 (11th Cir. 2006) (concluding that a five-day detention where there was no evidence of harm did not compel a finding of past persecution).

Second, the record does not compel a finding that this alleged persecution was on account of Parra's political opinion, as opposed to his refusal to cooperate with the FARC and give them money. See Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 438 (11th Cir. 2004). There is little, if any, evidence in the record showing that the FARC was even aware of Parra's political opinion. Further, Parra cannot demonstrate persecution on account of his political opinion, actual or imputed, simply by showing that he was threatened for refusing to cooperate with the FARC's extortionate demands. As this Court has explained:

> To qualify for withholding of removal based on persecution by a guerilla group on account of a political opinion, [the petitioner] must establish that the guerillas persecuted [him] or will seek to persecute [him] in the future because of [his] actual or imputed political opinion. It is not enough to show that [he] was or will be persecuted or tortured due to [his] refusal to cooperate with the guerillas.

Id. (citation omitted). Finally, there is nothing in the record to compel a reversal of the IJ's determination that the petitioners failed to show that they would more likely than not suffer persecution if they returned to Colombia.

11

**E.      Denial of Motion to Reopen**

A petitioner may file a motion to reopen with the BIA which "shall state the new facts that will be proven at a hearing to be held if the motion is granted and shall be supported by affidavits or other evidentiary material."  8 C.F.R. § 1003.2(c)(1).  "A motion to reopen proceedings shall not be granted unless it appears to the [BIA] that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing."  Id.

The BIA did not abuse its discretion by denying the petitioners' motion to reopen.[5]  The petitioners' motion was based on the fact that they had obtained a copy of Esteban's asylum application, which was not available at the time of their asylum hearing.  We agree with the BIA that this evidence did not constitute new facts sufficient to justify reopening the proceedings given that (1) the IJ already was aware that Esteban had been granted asylum, and (2) Esteban had testified regarding his asylum claims at the petitioners' hearing.  Furthermore, based on these same reasons, we conclude that there was no due process or equal protection

---

[5]We review the BIA's denial of a motion to reopen for abuse of discretion.  Ali v. U.S. Att'y Gen., 443 F.3d 804, 808 (11th Cir. 2006).  This review is "limited to determining whether there has been an exercise of administrative discretion and whether the matter of exercise has been arbitrary or capricious."  Id. (quotation marks omitted).  The petitioners' constitutional claims are reviewed de novo.  Id.

12

violation as a result of the IJ's decision to conduct the petitioners' hearing without a copy of Esteban's asylum application.

### III.  CONCLUSION

For the above reasons, we dismiss in part and deny in part the petitions for review.

**PETITIONS DISMISSED** in part; **DENIED** in part.